UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL J. SZCZESNY,

      Plaintiff,

    v.

VILLAGE OF RIVER FOREST, et al.

      Defendants.

No. 20 CV 5661

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Daniel Szczesny was a Village of River Forest police officer and the president of the local police union. Near the end of his tenure in both roles, the Village added a new squad car to its fleet. Szczesny and other officers had problems with the car and complained within the police department. Dissatisfied with the response, Szczesny and the union board wrote a letter to the chief of police expressing concerns about the car's risks to officer and community safety. Szczesny claims that he faced retaliation for this letter. He brings First Amendment retaliation claims under § 1983 against the Village, Police Chief James O'Shea, Sergeants Michael Swierczynski, Martin Grill, and Justin Labriola, and Human Resources Director Lisa Scheiner. He also brings claims against the Village, O'Shea, and Scheiner for defamation per se and intentional interference with a prospective economic advantage under Illinois law, and against the Village under the Illinois Personnel Record Review Act, 820 ILCS 40/1 *et seq*. Defendants move to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). The motion is granted in part and denied in part.

## I.  Legal Standards

A complaint must contain a short and plain statement that plausibly suggests a right to relief. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts that "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I accept all factual allegations as true and draw all reasonable inferences in Szczesny's favor, but I disregard legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Iqbal*, 556 U.S. at 678.

## II.  Facts

Szczesny became a Village of River Forest police officer in 2013. [1] ¶ 16.[1] About five years later, Szczesny became the president of the River Forest branch of the Fraternal Order of Police. *Id.* ¶ 26. As union president, Szczesny advocated for union members on assignments and pay, and raised issues about the department's administration, policies, and procedures. *Id.* ¶¶ 30, 34.

In June 2019, Sergeant Grill sent a department-wide email advising officers of a newly acquired squad car. *Id.* ¶ 40. The first time Szczesny used it, he was unable to get the car to shift into drive when trying to pull out of a parallel-parking space behind the police station; the second time, Szczesny was unable to shift into drive and respond to an in-progress police call for service. *Id.* ¶¶ 42–43. The culprit, Szczesny concluded, was the new vehicle's "Auto Park" software, which "effectively disabled

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. Facts are taken from the complaint, [1].

the vehicle, preventing the transmission from engaging and stopping the vehicle from being shifted into drive." *Id*. ¶¶ 44–45.

Szczesny sent an email to the department detailing the problems with the Auto Park feature and explaining potential problems that the program might pose for officers when responding to in progress calls, assisting other officers in distress, or being able to quickly maneuver the vehicle in a potential ambush attack; Szczesny recommended that the department take the car out of service until the problems could be addressed. *Id*. ¶¶ 46–47; [18-2] at 1. Sergeant Grill responded to the email and explained the purpose of the program and its value, but he did not address the officer safety concerns Szczesny raised, and the vehicle remained in service. [1] ¶¶ 49–51. Thirteen other officers came to Szczesny with similar safety concerns about the vehicle. *Id*. ¶ 52. The officers "expressed alarm that the Village would not take the vehicle out of service when its performance was inconsistent and a represented a danger to public and officer safety." *Id*.

After weeks of back-and-forth with department management over the vehicle's problems, *see id*. ¶¶ 46–49, 53–58, 68, Szczesny and the union's executive board worked on a letter to Chief O'Shea "to document the concerns of union members regarding the Department and Village's lack of concern for public and officer safety." *Id*. ¶ 70. The final letter "expressed the union's concern with the way in which the situation was handled; mainly ordering officers to use a vehicle that posed a safety risk to themselves and the public." *Id*. ¶ 78. The union submitted the letter, backed by the union's board and printed on FOP letterhead, to O'Shea. *Id*. ¶ 75.

3

The next day, Grill posted a five-page response on the union cork board, claiming that O'Shea and the administration had focused on the safety of officers from the moment the officers raised issues about the vehicle. *Id.* ¶ 79. Grill's response also ridiculed officer complaints, downplayed the issue, and personally attacked the union's leadership. *Id.* ¶ 80. The day after Grill posted the administration's response, the union posted a copy of its letter to O'Shea on the cork board. *Id.* ¶ 82.

Szczesny alleges that he was retaliated against after the union sent the letter to O'Shea. Sergeant Labriola, for example, falsely accused Szczesny of filing an inaccurate report in an investigation. *Id.* ¶ 86. Over the next few days, Szczesny received a hostile email from Labriola, and he accused Szczesny of putting false information into a police report. *Id.* ¶¶ 87–88. O'Shea, for his part, sent an email to the entire union executive board demanding a retraction of the letter and warning: "You, as the executive board members of the board and authors of the letter, will have until Monday at 5pm to retract your letter, apologize, and ask appropriately for a meeting with the vehicle officer and Chief of Police." *Id.* ¶ 88. O'Shea met with the union's labor representative and issued the same demand for a retraction, this time backed by a threat: without a retraction, "internal investigations into the union board will be initiated," and "Szczesny was going to be investigated for suspicion of lying in the union letter and in police reports, and that Szczesny should quit the Department." *Id.* ¶¶ 93, 97. O'Shea also threatened to report Szczesny to the Cook County State's Attorney's Office, the law school Szczesny was attending, the Law Enforcement Training and Standards Board, and the Illinois Bar Association for being untruthful.

4

*Id.* ¶ 95. O'Shea told the representative "that he was not certain if Szczesny would even be able to become an attorney unless the union retracted the letter and Szczesny quit." *Id.* If Szczesny resigned, however, O'Shea said other members of the union board would be spared further discipline. *Id.* ¶¶ 95–96.

On several occasions, Sergeant Swierczynski and Chief O'Shea pressed Szczesny to reveal to them the names of the officers who anonymously complained about the vehicle. *Id.* ¶ 92. When Szczesny refused and invoked the employee-union representative privilege, Swierczynski responded "in a threatening and retaliatory manner," accused Szczesny of lying in response to his inquires, and concluded that "there will be no more emails/memos between you and me on these matters. I will be reviewing your responses and other available information … [and] making recommendations to the Chief of Police." *Id.* ¶ 94. Several sergeants, including Swierczynski, Labriola, and Grill, also publicly posted a letter personally attacking the union board and singling out Szczesny by name. *Id.* ¶ 100. By mid-September (a few weeks after Szczesny and the union's letter about the new squad car), O'Shea informed the union representative that investigations would be moving forward against Szczesny and the board, and the Chief continued to insist on the retraction of the letter and Szczesny's resignation. *Id.* ¶¶ 101–07. On October 1, 2019, after months of such threats, Szczesny resigned from the department. *Id.* ¶ 110.

The week after he resigned, Szczesny requested his personnel file. *Id.* ¶ 113. Lisa Scheiner, the Village's Assistant Administrator and Human Resources Director, provided Szczesny an accounting of his final payout, an offer to provide a full and

accurate accounting of his belongings, and acknowledged his request for his file. *Id.* ¶ 114. Szczesny did not receive his personnel file until late October, three weeks after he submitted his request. *Id.* ¶ 116. The file included an October 2, 2019 memo from O'Shea to Scheiner that made false allegations against Szczesny; it falsely stated that Szczesny had been the subject of three internal investigations since August 2019, and that he had been placed on administrative leave on October 2—the day after his resignation had taken effect. *Id.* ¶¶ 117–19. Szczesny asked the Village to remove the false documents, but it did not do so until December. *Id.* ¶¶ 130–32. When Szczesny received an updated copy his file, he believed that it included documents that violated the Illinois Personnel Record Review Act and were either false or cherry-picked to make him look bad. *Id.* ¶¶ 148–52. Szczesny submitted a rebuttal and supplemental documents to correct the record in February 2020, but the Village did not provide him with a corrected copy of the file until June. *Id.* ¶¶ 153, 157.

By then, Szczesny had been disqualified or otherwise passed up for jobs with three other police departments, including Crystal Lake and Oak Brook. *Id.* ¶ 158. As part of Crystal Lake's background-investigation process, a representative met with O'Shea, who falsely told the representative that Szczesny had been the subject of three internal investigations, "did not make good" on repaying officers who had worked for him, and lied in a police report. *Id.* ¶¶ 124–26, 128–29. O'Shea also falsely said that the Cook County State's Attorney's Office was dropping all of Szczesny's active cases. *Id.* ¶ 127. Crystal Lake later informed Szczesny that he was no longer being considered for a job based on the information the Village provided. *Id.* ¶ 134.

Later, HR Director Scheiner met with Oak Brook's investigator and showed him false documents pertaining to the three alleged investigations into Szczesny. ¶¶ 139–43. Although the remainder of the Oak Brook investigator's report was positive, he listed these allegations as "integrity violations," "lying in his official capacity," "unreasonable use of discretion," and failure to obey orders. *Id.* ¶¶ 145–46. The Oak Brook Police Department notified Szczesny that he had been disqualified from the hiring process because he failed "to pass the character and background requirement of the testing process." *Id.* ¶ 147.

Szczesny alleges that defendants' actions reflect a Village policy, custom, or pattern of targeting union board members with investigations and harsher discipline by sergeants, the department, and the Village administration. *Id.* ¶¶ 159, 178. Szczesny asserts that the defendants violated his First Amendment rights when they retaliated against him. *Id.* ¶¶ 173, 177. He brings (1) First Amendment retaliation claims against all defendants under § 1983; (2) state-law claims for defamation per se and intentional interference with a prospective economic advantage against the Village, O'Shea, and Scheiner; and (3) a claim under the Illinois Personnel Record Review Act against the Village.

## III. Analysis

### A. First Amendment Retaliation

To state a First Amendment retaliation claim, a public employee "must first establish that his speech was constitutionally protected." *Lett v. City of Chicago*, 946 F.3d 398, 400 (7th Cir. 2020). The First Amendment does not protect run-of-the-mill

employee grievances, but a public employee maintains First Amendment rights "in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). A public employee must therefore allege that "(1) he made the speech as a private citizen, [and] (2) the speech addressed a matter of public concern." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (citing *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)). Defendants argue that Szczesny's First Amendment retaliation claims fail because he spoke as an employee regarding a private interest, not as a private citizen on a public concern.

### 1.    *Private Citizen*

Szczesny has sufficiently alleged that he spoke as a private citizen. If a public employee speaks "pursuant to [his] official duties," then he is speaking as an employee and not a private citizen, and his speech is not constitutionally protected. *Garcetti*, 547 U.S. at 421. The question is "whether the speech 'owes its existence to a public employee's professional responsibilities.'" *Lett*, 946 F.3d at 400 (quoting *Garcetti*, 547 U.S. at 421). But if "the public employee is speaking in his capacity as a union representative, [then] he is speaking as a citizen." *Graber v. Clarke*, 763 F.3d 888, 895 (7th Cir. 2014). Here, the complaint plausibly alleges that the union's August letter to O'Shea—co-authored by Szczesny in his capacity as the union's president and on union letterhead—was private-citizen speech outside of Szczesny's official duties. *See Olendzki v. Rossi*, 765 F.3d 742, 747 (7th Cir. 2014) ("Our circuit has consistently held that when a public employee speaks in his capacity as a union official, his speech is not within the purview of his 'official duties.'"). Defendants say

that the union's August letter is "without consequence" because Szczesny initially reported the vehicle's problems in his July email "as a patrol officer and not through the channels of the police union." [18] at 5. But whether Szczesny initially complained in his capacity as an employee or not, the complaint alleges facts that reasonably suggest Szczesny faced retaliation because of his speech as the union's president. I draw that inference in his favor at this stage.

2. *Public Concern*

Even when speaking as a private citizen, however, an employee's speech is protected only if it addresses a matter of public concern. A public concern is something that is of "legitimate news interest," or addresses "a subject of general interest and of value and concern to the public at the time of publication." *Kubiak v. City of Chicago*, 810 F.3d 476, 482 (7th Cir. 2016) (quoting *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 684 (7th Cir. 2014)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). Content is the most important factor. *See Kubiak*, 810 F.3d at 483. Motive may be relevant, but it is not dispositive, and even if the speaker has a personal motive, "if an objective of the speech was also to bring about change with public ramifications extending beyond the personal, then the speech does involve a matter of public concern." *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 986 (7th Cir. 2013); *see also Adams v. Bd. of Educ. of Harvey Sch. Dist. 152*, 968 F.3d 713, 716 (7th Cir. 2020) (a mixed motive does not render speech unprotected). In the end, courts

consider the three *Connick* factors to determine "the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Kristofek*, 712 F.3d at 985 (quoting *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985)); *see also Adams*, 968 F.3d at 716 (the question is "whether the speech concerns public affairs as *Connick* understands the public/private distinction").

Generally, a police officer's "speech that addresses questions of public safety and police protection" involves "matters of vital public concern." *See Campbell v. Towse*, 99 F.3d 820, 828 (7th Cir. 1996); *Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir. 1990) ("It would be difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety."). An officer's speech is of public concern when it addresses "the manner in which the police would serve the public," but not when speech merely addresses inside matters pertaining to work conditions, such as a change in equipment allocation. *See Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 975 (7th Cir. 2000).

The union letter here frames the problems with the vehicle as "a significant issue of officer and public safety." [21-1] at 1.[2] The union board detailed problems that the car's "Auto Park" software caused not just for Szczesny, but for multiple other officers as well. *Id*. at 1–4; [1] ¶ 52. The letter expressed fear for the officers' ability

---

[2] Szczesny attaches the letter to his response brief, *see* [21-1], which I consider at this stage because it is "critical to the complaint and referred to in it." *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012); [1] ¶ 78.

to respond to in-progress calls and claimed, for example, that one officer was unable to effectively respond "to an in-progress-15-person fight" because the "Auto Park" system locked the car in park. [21-1] at 3–4. Chief O'Shea brushed aside these safety concerns and, according to the letter, ordered officers to continue using the vehicle. *Id*. at 3. Szczesny and the union board concluded: "We hope that in the future, a more appropriate response will be issued when officer safety concerns are presented to the Administration, and the Administration will work with, and not ridicule the 'false expertise' of its officers." *Id*. at 7.

Reading the complaint in a light most favorable to Szczesny, he has plausibly alleged that the union letter addressed a matter of public concern. The letter directly tied the vehicle's problems—and the administration's indifference to them—to broader officer and public safety concerns. The letter is not just Szczesny's personal grievance written on union letterhead. It is an effort by Szczesny and the union board to alert the department to an issue of public and officer safety.

Defendants arguments to the contrary are unpersuasive. They say the form (internal communications) and context (ongoing dialogue between officers and command about the vehicle) suggest that this was a private work issue. [18] at 7. As for content, defendants hang their hat on *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967 (7th Cir. 2000), which held, in relevant part, that an officer's speech criticizing a police chief's policy of allowing officers to carry only one set of handcuffs was not a matter of public concern. *Id*. at 974–75. Defendants read *Kuchenreuther* to

11

say that "complaints regarding department equipment" are never matters of public concern. [24] at 5.

But *Kuchenreuther* is not so broad, and other cases acknowledge that speech about police resource allocation can be protected. *See Campbell*, 99 F.3d at 828 ("Issues involving the proper allocation of police patrols and other departmental resources to various communities in a city are questions of serious public import."). The court in *Kuchenreuther* concluded that "[a]fter reviewing the record in this case, we are convinced that Kuchenreuther did not address the manner in which the police would serve the public." *Kuchenreuther,* 221 F.3d at 975. Here, by contrast, Szczesny spoke on matters of safety and how the department would serve the public (through, among other things, safely and effectively responding to in-progress calls)—or so one can infer at this stage of the case. Whether Szczesny's complaint about the car's software and its corresponding effect on police performance is more like Kuchenreuther's problem with having one set of handcuffs or Campbell's concern over the efficacy of a patrol program requires factual development. And while the letter was an internal document, First Amendment protection is not lost to "the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16 (1979). Szczesny has sufficiently alleged that he was speaking on a matter of public concern. *Cf. Kristofek*, 712 F.3d at 983 (liberal construction of complaint's allegations to find public concern should not "be read to prejudge whether the evidence will show that [plaintiff's] claims … are meritorious").

### 3. *Retaliation Claims Against Swierczynski and Scheiner*

In the alternative, defendants argue that even if Szczesny's speech is entitled to constitutional protection, he has failed to allege that defendants Scheiner and Swierczynski participated in the retaliation against him. While Szczesny engaged in constitutionally protected speech, he must also show that each defendant, as a public official, "engaged in adverse conduct against him" and was "motivated, at least in part, by his protected speech." *Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010). To constitute adverse conduct, a defendant's actions must "likely deter a person of ordinary firmness from continuing to engage in protected activity." *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011). Whether retaliatory conduct reaches this threshold is generally a question of fact. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Yet "when the asserted injury is truly minimal," a court "can resolve the issue as a matter of law." *Douglas v. Reeves*, 964 F.3d 643, 647 (7th Cir. 2020).

The complaint sufficiently puts Swierczynski on notice of Szczesny's First Amendment retaliation claim. The complaint alleges that Swierczynski "pressed [Szczesny] to reveal … the names of officers who complained about the vehicle" and when Szczesny rebuffed those efforts, Swierczynski responded in a "threatening and retaliatory manner." [1] ¶¶ 92, 94. And, along with other sergeants, Swierczynski publicly posted a letter attacking Szczesny by name. [1] ¶ 100. It is reasonable to infer that Swierczynski's communications were in response to the union's letter: Szczesny raised the anonymous complaints in the letter, and Swierczynski then pressed Szczesny to name names; Swierczynski's hostility to Szczesny traces to the union

letter. His conduct—a sergeant pressing an officer to reveal his sources, threatening to accuse the officer of falsehoods to the chief, and cutting off discussion—plausibly suggests the kind of conduct that would deter a reasonable person from holding or expressing his protected views. *See Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 534 (7th Cir. 2006) (campaign of minor harassment can be sufficient to deter the exercise of free speech); *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) (petty harassment that includes minor retaliation and false accusations can be actionable under the First Amendment); *see also Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) ("Harassment of a public employee for his political beliefs violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs."). True, Szczesny does not provide many details of his communications with Swierczynski, but that is not required at this stage. When discovery reveals these communications in more detail, Szczesny will have to prove—at summary judgment or trial—that Swierczynski's conduct would deter a person of ordinary firmness from speaking and that it was motivated by the union letter (not routine employment grievances). But the complaint puts Swierczynski on sufficient notice of the claims against him to survive dismissal.

The same cannot be said for Szczesny's retaliation claim against Scheiner. The complaint does not raise a reasonable inference that Scheiner had any knowledge of the union letter or took any adverse action due to Szczesny's protected speech. Szczesny argues that Scheiner provided false information to prospective employers,

and that because Scheiner is employed as an Assistant Village Administrator, his allegations that the Village Administration engaged in retaliatory conduct also apply to her. [21] at 14–15. But conclusory allegations aside, the complaint does not plausibly allege that Scheiner knew about the union letter or that the information in the file was false, let alone that after Szczesny had left the department, she intentionally provided the false information to retaliate against him because of the letter. The allegations against Scheiner are too attenuated from the speech at issue— too speculative—to raise a reasonable inference that her actions violated Szczesny's First Amendment rights.

In sum, the complaint sufficiently alleges that Szczesny's speech was entitled to constitutional protection, but it does not plausibly allege that Scheiner participated in any retaliatory conduct. Count I is dismissed with respect to Scheiner, but it survives against all other defendants.

## B. State Tort Claims

Szczesny next alleges that the Village, O'Shea, and Scheiner are liable for defamation per se and intentional interference with a prospective economic advantage.

### 1. *Defamation Per Se*

To state a claim for defamation, a plaintiff must show that "the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and the publication caused damages." *Hadley v. Doe*, 2015 IL 118000, ¶ 30. "A statement is defamatory per se if its harm is

15

obvious and apparent on its face." *Id*. Under Illinois law, statements that impute "an inability to perform or want of integrity in performing employment duties" or "a lack of ability or that otherwise prejudice a person in his or her profession" are defamatory per se. *Tuite v. Corbitt*, 224 Ill.2d 490, 501 (2006). Here, Szczesny asserts that O'Shea and Scheiner made intentionally false statements to third parties (Crystal Lake and Oak Brook)[3] that imputed an inability to perform his job or a lack of integrity to discharge his duties as an officer. [1] ¶¶ 182–188.

Defendants counter that they are immune from the defamation claim. Immunity is an affirmative defense that the complaint need not anticipate. *See Elliott v. Thomas*, 937 F.2d 338, 345 (7th Cir. 1991); *see also Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). A court should refrain from granting a Rule 12(b)(6) motion on affirmative defenses unless "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005); *see also Brownmark Films*, 682 F.3d at 690. The complaint does so here.

Illinois law shields the Village from defamation suits. Under the state's Tort Immunity Act, "[a] local public entity is not liable for injury caused by any action of its employees that is libelous or slanderous or for the provision of information." 745

---

[3] Defendants posit that any claims arising from conduct during the Oak Brook or Crystal Lake background investigations must be dismissed because Szczesny executed releases with those municipalities regarding any claims arising out of the investigations. [18] at 21–22. Defendants also attach the releases to their brief supporting the motion. Unlike the union letter, I do not consider the releases because (1) they are not central to plaintiff's claim and (2) release is an affirmative defense that the complaint need not anticipate. *See* Fed. R. Civ. P. 8(c)(1).

ILCS 10/2-107. In other words, the Act "gives public entities blanket immunity against defamation claims." *Heckenbach v. Bloomingdale Fire Prot. Dist.*, No. 19-CV-2877, 2020 WL 5763600, at *7 (N.D. Ill. Sept. 28, 2020); *see also Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 617 (7th Cir. 2001) (local public entities may not be sued for defamatory remarks in Illinois). As such, the defamation claim against the Village fails.

O'Shea and Scheiner are immune from the defamation claim too. Section 2-210 of the Tort Immunity Act provides that "[a] public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or the provision of information." 745 ILCS 10/2-210. The question here, as in all defamation cases against local employees under Illinois law, is whether O'Shea and Scheiner "were acting within the scope of their official duties when they made the alleged statements in question." *Horwitz*, 260 F.3d at 617. If the answer is yes, then the public employee has absolute immunity, and "even if a statement is defamatory, under Illinois law, the defendants would have immunity for their statements made within the scope of their authority." *Klug v. Chicago Sch. Reform Bd. of Trustees*, 197 F.3d 853, 861 (7th Cir. 1999).

O'Shea and Scheiner were acting within the scope of their official duties when they made the alleged defamatory statements. The complaint does not plausibly suggest—and Szczesny does not argue in his brief—that O'Shea's and Scheiner's statements to his prospective employers were made outside the scope of their authority. In fact, the face of the complaint establishes the opposite—both Scheiner

17

and O'Shea were acting under Village authority "with regard to [their] acts and conduct alleged herein." [1] ¶¶ 7, 9.

Szczesny advances only one argument against immunity—O'Shea and Scheiner intentionally provided false information and "Section 2-210 only immunizes misrepresentations that are made negligently." [21] at 17–18. The latter assertion is incorrect. Because O'Shea's and Scheiner's statements were made within the scope of their duties, they enjoy absolute immunity from defamation suits, which "cannot be 'overcome by a showing of improper motivation or knowledge of the statement's falsity, including malice.'" *Horwitz*, 260 F.3d at 618 (quoting *Klug*, 197 F.3d at 861); *see also Heckenbach*, 2020 WL 5763600 at *8 (if within scope of authority, even allegations that defendants' "'conduct was willful, wanton, malicious, and ... made with actual malice' doesn't save the day").

Because Szczesny's factual allegations "unambiguously establish all the elements of" defendants' statutory immunity defense, *see Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016), Count II is dismissed.

2.    *Intentional Interference with a Prospective Economic Advantage*

A plaintiff bringing a claim for intentional interference with a prospective economic advantage must allege: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Anderson v. Vanden Dorpel*, 172 Ill.2d 399, 406–

07 (1996). Some forms of interference are privileged, and when that's the case, "the plaintiff bears the burden of proving that the defendant's conduct was malicious." *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 171 (7th Cir. 1993). In tortious interference cases, "an employer may invoke a conditional privilege to respond to direct inquiries by prospective employers." *Id.* at 171–72. But the plaintiff can overcome the privilege if he shows that the defendant's conduct is malicious; that is, "if the defendant acts 'intentionally and without justification.'" *KMK Grp., LLC v. Helco Corp.*, 380 F.Supp.3d 790, 799 (N.D. Ill. 2019) (quoting *Delloma*, 996 F.2d at 171). Illinois law does not offer a clear answer on "whether privilege must be asserted as an affirmative defense or whether the plaintiff must prove that no privilege applies, but there is no need to resolve that question at the pleading stage if the plaintiff's 'allegations overcome the privilege.'" *KMK Grp.*, 380 F.Supp.3d at 799 (quoting *Webb v. Frawley*, 906 F.3d 569, 578 (7th Cir. 2018)).

Here, defendants contend that the intentional interference claim must be dismissed as to all defendants "because employers are privileged with regard to reference checks, and [Szczesny] has not sufficiently alleged any facts to overcome that privilege." [18] at 17. They also argue that the claim against Scheiner should be dismissed because Szczesny has not alleged that Scheiner purposefully interfered with an expectancy. Szczesny counters that he has adequately alleged that O'Shea and Scheiner provided false information to Crystal Lake and Oak Brook "and knowingly and willfully, with intent to injure [Szczesny], acted with actual malice, or acted in reckless disregard of the truth." [21] at 21.

19

Szczesny has sufficiently alleged that O'Shea acted with actual malice. The complaint alleges that O'Shea met with the representative from Crystal Lake and falsely claimed that (1) Szczesny was the subject of three internal investigations during his final months with the force, (2) Szczesny had lied in a police report, (3) the Cook County State's Attorney's Office was dropping all of Szczesny's active cases, and (4) Szczesny "did not make good" on repaying officers who worked for him. [1] ¶¶ 124, 125, 127, 129. Szczesny has plausibly alleged that O'Shea's series of falsehoods impugning his character amounted to an intentional and unjustified effort to sink his chances with a prospective employer. So the claim against O'Shea survives.[4]

Count III is dismissed as to Scheiner, however, because the complaint does not plausibly allege that she purposefully interfered with Szczesny's job opportunities. The complaint alleges that Scheiner met with a background investigator from Oak Brook and showed him false documents pertaining to internal investigations into Szczesny. *Id.* ¶¶ 137–143. But the complaint does not allege that Scheiner did anything more than provide the investigator with Szczesny's file, which happened to contain some false information. The complaint does not allege that Scheiner knew the file contained false documents, played any role in creating the documents, or had any intent or reason to interfere with Szczesny's opportunity with Oak Brook. Accordingly, the intentional interference claim against Scheiner is dismissed.[5]

---

[4] The Village does not present any argument for its dismissal from the intentional-interference claim, so it remains a defendant.

[5] Defendants also ask that I strike Szczesny's prayer for punitive damages in Counts II and III, arguing that they are immune from punitive damages under 745 ILCS 10/2-102 and 745 ILCS 2-213. I've dismissed Count II against all defendants and Count III against Scheiner. For the remaining Count III claims, the type of relief to which Szczesny may be entitled (if

### C. Illinois Personnel Record Review Act

Szczesny also brings a claim against the Village under the Illinois Personnel Record Review Act, 820 ILCS 40/1 *et seq.*, for failing to timely provide his personnel file. Defendants move to dismiss this claim because the complaint does not allege that Szczesny exhausted administrative remedies with the Illinois Department of Labor. But failure to exhaust administrative remedies is an affirmative defense that the complaint need not anticipate. *See Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) ("Failure to exhaust administrative remedies is an affirmative defense."); *see also Mosely*, 434 F.3d at 533 (plaintiff has no obligation to allege facts negating an affirmative defense in complaint when there is nothing on the face of complaint "that compels a conclusion that she failed to exhaust"). The complaint does not demonstrate failure to exhaust on its face and dismissal of the claim on that basis is unwarranted.

## IV. Conclusion

Defendants' motion to dismiss the complaint, [18], is granted in part and denied in part. The motion is granted as to the First Amendment retaliation claim against Scheiner, the defamation per se claims against Scheiner, O'Shea, and the Village, and the intentional-interference claim against Scheiner. These claims are dismissed without prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015) (an initial dismissal for failure to state a claim should be without prejudice, and a plaintiff "should be given at least

---

any) is a matter that I leave for another day. *See* Fed. R. Civ. P. 54(c) (every final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings).

one opportunity to try to amend her complaint before the entire action is dismissed").
As to the remaining claims, the motion is denied. The defendants, other than
Scheiner, shall file an answer to the complaint by June 28, 2021. The parties shall
file a status report with a proposal for a discovery schedule by July 6, 2021.

ENTER:

Manish S. Shah
United States District Judge

Date: June 7, 2021