**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DANIEL SZCZESNY, | |
|           Plaintiff, | |
|    v. | Case No. 20 CV 5661 |
| VILLAGE OF RIVER FOREST, a unit of local Government, LISA SCHEINER, in her individual capacity, JAMES O'SHEA, in his individual capacity, MICHAEL SWIERCZYNSKI, in his individual capacity, MARTIN GRILL, in his individual capacity, and JUSTIN LABRIOLA, in his individual capacity. | Judge Manish S. Shah |
|           Defendants. | Plaintiff Demands Trial by Jury |

**FIRST AMENDED COMPLAINT**

Plaintiff DANIEL SZCZESNY, complaining against Defendants, VILLAGE OF RIVER FOREST, a unit of local Government, LISA SCHEINER, in her individual capacity, JAMES O'SHEA, in his individual capacity, MICHAEL SWIERCZYNSKI, in his individual capacity, MARTIN GRILL, in his individual capacity, and JUSTIN LABRIOLA, in his individual capacity, states as follows:

1.      Plaintiffs bring this action to redress acts of retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983 in violation of Plaintiffs' rights to free speech, union association, and political association.

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction pursuant to 42 U.S.C. §1983 and 28 U.S.C. §1343. This Court has supplemental jurisdiction over Plaintiff's claims arising under Illinois law pursuant to 28 U.S.C. §1367.

3.      Venue is proper in this judicial district under 28 U.S.C. §1391(b) and (c) because Plaintiffs and all Defendants either reside in this district or have their principal place of business in this district, and all events giving rise to Plaintiffs' claims occurred within this district.

## PARTIES

4.      Plaintiff DANIEL SZCZESNY ("Plaintiff" or "Szczesny"), was, at all relevant times, a full-time, sworn, police officer with the Village of River Forest.

5.      Defendant VILLAGE OF RIVER FOREST ("Village" or "River Forest") is a municipality incorporated under the laws of the State of Illinois. River Forest administers itself through departments, one of which is the Village of River Forest Police Department.

6.      At all relevant times, Defendant Lisa Scheiner, was employed by the Village of River Forest as both the "Assistant Village Administrator," and later "Acting Village Administrator," and "Human Resources Director." Scheiner is sued in her individual capacity.

7.      Defendant Scheiner was a policy maker for the Village of River Forest and has final policy making authority for the Village of River Forest with regard to her acts and conduct alleged herein.

8.      Defendant James O'Shea is sued in his individual capacity. Defendant O'Shea was Chief of Police for the River Forest Police Department and acted under color of law.

9.      Defendant O'Shea was appointed Chief of Police by the Village of River Forest and served solely at the discretion and pleasure of the Village. The Village delegated final policy making authority to Defendant O'Shea with regard to his acts and conduct alleged herein.

10.     Defendant Michael Swierczynski is sued in his individual capacity. Defendant Swierczynski was a Sergeant of the River Forest Police Department and acted under color of law.

11.     Defendant Swierczynski was promoted to Sergeant by the Village of River Forest and served at the discretion and pleasure of the Village. The Village delegated final policy making authority to Defendant Swierczynski with regard to his acts and conduct alleged herein.

12.     Defendant Martin Grill is sued in his individual capacity. Defendant Grill was a Sergeant of the River Forest Police Department and acted under color of law.

13.     Defendant Grill was promoted to Sergeant by the Village of River Forest and served at the discretion and pleasure of the Village. The Village delegated final policy making authority to Defendant Grill with regard to his acts and conduct alleged herein.

14.     Defendant Justin Labriola is sued in his individual capacity. Defendant Labriola was a Sergeant of the River Forest Police Department and acted under color of law.

15.     Defendant Labriola was promoted to Sergeant by the Village of River Forest and served at the discretion and pleasure of the Village. The Village delegated final policy making authority to Defendant Labriola with regard to his acts and conduct alleged herein.

**FACTS UPON WHICH CLAIMS ARE BASED**

**I.     Employment History**

16.     On October 7, 2013, Plaintiff Szczesny was hired as a full-time, sworn Police Officer by the Village of River Forest.

17.     At all relevant times, Szczesny satisfactorily fulfilled his assigned duties.

18.     As a new officer, Szczesny completed his 16-week Field Training (FTO) program with extremely high marks, achieving a rating of "Exceeding Standard" in every category on his Daily Activity Reports for the last 9 days of the training period.

19.     During his employment, Szczesny's performance was reviewed at the end of each calendar year by his supervisor. The reviews were then submitted to the Department's

Administration for further command review. All of the reviews were approved by the Department's Administration.

20.     All of Szczesny's performance evaluations were "Exceeds Expectations" except for his first year on the job when he was ranked as "Meets Expectations" but still ranked number one for his shift in regard to productivity despite not having a full year of solo patrol.

21.     Szczesny was awarded the River Forest Police Department Officer of the Year Award for his performance in 2016 and 2017.

22.     Szczesny was also named the River Forest Fraternal Order of Police Lodge #46 Officer of the Year for both 2016 and 2017.

23.     Szczesny also received at least seventeen other (17) Department-awarded commendations during the course of his employment, including Notable Performance notices, Unit Citations, Unit Arrest Citations, Honorable Mentions, Investigations Unit Citations, and Letters of Recognition.

24.     Szczesny was recognized by outside agencies for his skill and character as well, receiving awards for his DUI enforcement.

25.     In 2018, prior to Szczeny's election as union president, Defendant Chief James O'Shea authored a letter of recommendation in support of Szczesny's nomination for the University of Illinois ACES Alumni Association "Outstanding Young Alumni" award. Defendant O'Shea wrote, in part, "… Dan has been a positive force for change in our profession and community… Cooperation, collaboration, and communication are areas where Dan has proven his value to both the organization and the community."

## II. Union Activities

26.     On June 1, 2018, Szczesny was elected as President of the River Forest Fraternal Order of Police Lodge #46.

27.     On June 8, 2018, Szczesny held a union executive board meeting at the Community Bank in River Forest to introduce himself and his fellow executive board members to the labor council representatives assigned to River Forest FOP Lodge #46.

28.     During this meeting, the Executive Board learned that the Village was negotiating on behalf of the Sergeants to break up the union.

29.     Upon being elected union president, Defendant O'Shea reached out to Szczesny in his capacity as union president and encouraged Szczesny to "always bring things to me [Chief O'Shea] first." Defendant O'Shea also stated that "informal, sideline dialogue" was always welcomed.

30.     As union president, Szczesny advocated for union members in regard to time off exceptions, shift schedules, officer in charge pay, and compensatory time. Szczesny was also involved in contract negotiations with the Village.

31.     In retaliation for his advocacy, Plaintiff was reprimanded for bringing issues to the Chief and going outside the chain of command, despite the Chief's directive.

32.     Defendant Sergeant Labriola screamed at him and called him a "mother fucker," and a "piece of shit," compared him to the previous union president who was forced to resign from the department, and warned him to be very careful and accused Szczesny of using the union for personal gain.

5

33.     These measures had the effect of chilling Szczesny's first amendment right to associate with the union and speak out against instances that violated the contractual bargaining agreement.

34.     Szczesny asserted the employee-union representative confidentiality privilege when Defendant Labriola demanded Szczesny reveal confidential and protected information about union members who were unhappy with the Department's administration, policies, and procedures.

35.     Defendant O'Shea threatened officers about the amount of grievances that they filed and discouraged officers from filing more.

36.     Defendant O'Shea and the Village Administration meddled in union matters to worsen working conditions, with the express goal of undermining the union's leadership.

37.     Defendant O'Shea refused to continue negotiations unless the union executive board submitted to his demands regarding internal union procedures.

38.     Defendant O'Shea accused Szczesny and other union executives of acting in "bad faith" and "tainting" the process. O'Shea demanded that the union re-poll its members or submit other proof that the union's information was truthful and accurate.

39.     In retaliation for the union members negotiating shift assignments, the Village accused Szczesny and his fellow union board members of "orchestrating a conspiracy" to make the shift picks so lopsided that the Department Administration could not successfully select shifts. Defendant O'Shea called the union a "dysfunctional organization" and criticized Szczesny's leadership.

### III.    Safety and Well-Being Complaints

40.    On June 18, 2019, Defendant Sergeant Grill sent a Department-wide email advising all officers that a newly acquired and equipped Dodge Durango squad car ("Car 4") had been cleared for patrol use after a "successful road test performed by Officer Humphreys."

41.    Defendant Grill's email detailed multiple features of the vehicle but made no mention of "Auto Park" software.

42.    On July 3, 2019 Szczesny was assigned to the vehicle and was unable to get the vehicle to shift into drive when trying to pull out of a parallel parking space behind the police station.

43.    On July 4, 2019, Szczesny was again assigned to Car 4 and was unable to shift the vehicle into drive and respond to an in-progress police call for service.

44.    Szczesny researched the problem and determined the "Auto Park" software was the source of the issue.

45.    The "Auto Park" software effectively disabled the vehicle, preventing the transmission from engaging and stopping the vehicle from being shifted into drive.

46.    On July 4, 2019, Szczesny wrote an email documenting Car 4's problem. In the email, Szczesny explained his concerns about the practical effect the "Auto Park" software had on the vehicle's performance.

47.    Szczesny explained public and officer safety concerns for responding to in progress calls, assisting other officers in distress, or being able to quickly maneuver the vehicle in a potential ambush attack.

48.    On July 9, 2019, five days later, Defendant Grill responded to Szczesny's Department wide-email and addressed the mechanical purpose of the program. Defendant Grill

7

went on to summarize information he had allegedly received from the "Program Manager at Fiat Chrysler" who also advised the program was "working as designed."

49.     Shortly thereafter, Defendant Grill sent a Department-wide email with a link to a YouTube video regarding the "Auto Park" software and extolling the program's value in ensuring that officers do not run themselves over with their squad cars.

50.     Szczesny did not believe either communication by Defendant Grill addressed the public and officer safety concerns he raised in the original email.

51.     Car 4 remained in service throughout this time period but saw sporadic use by officers due to the safety concerns that had been expressed to, but not addressed by, the Department and Village.

52.     During this time, more than thirteen officers expressed their concerns to Szczesny, in his capacity as union president, that the Department had not taken the vehicle out of service and was ignoring the issues raised. One officer specifically called the car a "death trap," and stated he would not be comfortable driving the vehicle until a solution was implemented. Other officers called the vehicle "dangerous" and a "serious safety risk."  Officers expressed alarm that the Village would not take the vehicle out of service when its performance was inconsistent and a represented a danger to public and officer safety.

53.     On July 15, 2019 Szczesny, acting in his capacity as union president, exchanged text messages with Defendant Grill stating that the car with the auto park program was unsafe to use in a law enforcement capacity.

54.     Via text message Defendant Grill stated, "…personally I don't think it's a big deal."

55.     Szczesny reiterated his concerns with the program and further advised Defendant Grill that the program was not working as the manual states it should be.

8

56.     Defendant Grill responded via text, "I'm not an engineer so I have no idea. My suggestion is to find a different battle."

57.     Szczesny responded via text, "I don't think officer safety should b [sic] a battle."

58.     Defendant Grill responded via text, "I will have a solution that I think will work relatively soon like this week so I'm just saying pick ur [sic] fights carefully otherwise it's wasted time."

59.     No solution was implemented within the next week, as Defendant Grill suggested would happen.

60.     On or about July 19 or July 26, Szczesny asked Defendant Grill what was being done to address the vehicle's issue and where the "solution" he had referenced in text message was.

61.     Defendant Grill was non-committal, said he was "working on it," and that he should hopefully have something to solve the problem soon.

62.     On July 23, 2019, Defendant Grill sent an email to the shift supervisors, copying in Defendants O'Shea and Swierczynski. The email inquired as to why Car 4 hadn't been "used in a while and wondering if there was a problem??"

63.     On July 23, 2019, Defendant O'Shea responded to Defendant Grill's email and ordered the midnight supervisor, Sergeant Buckner, to drive the car for the next few months. Defendant O'Shea cited his concerns for the vehicle's battery and tire pressure but did not address the safety issues raised by the presence of the "Auto Park" software.

64.     On July 23, 2019, Defendant O'Shea again responded to Defendant Grill's email and ordered the afternoon supervisor, Sergeant Czernik, personally drive the car for the next thirty days. In the email Defendant O'Shea criticized officer safety complaints as "some excuses and

some misguided false expertise in handling and performance…" Defendant O'Shea cited his concern for the vehicle's battery, alternator, computer, and tires as justification for ordering use of Car 4.

65.     On July 25, 2019, Defendant Grill emailed Defendant Swierczynski and then-Corporal Bowman to order them to use Car 4 every shift going forward. Defendant Grill did not address the officer safety issues with the vehicle.

66.     Between July 25, 2019 and August 19, 2019 numerous union members continued to approach Szczesny and other union board members to express concern about the Department's response to the safety issues that were raised about Car 4. Officers were most concerned with Defendant O'Shea's decision to order mandatory and around the clock use of the vehicle without a solution having been implemented.

67.     Defendant O'Shea told officers that they should click their seatbelts in behind their backs and they will be able to use the car without issue. This direction is a direct contradiction of Department policy.

68.     On August 12, 2019, Officer Balaguer sent a Department-wide email in reply to Szczesny's original email reporting the problems with Car 4. Balaguer described her experience of being unable to respond to an in-progress 15-person fight call due to the "Auto Park" system activating. There was no response or reply to Balaguer's Department-wide email.

69.     On July 18, 2019, the Village ordered seatbelt extenders as a work around to the problems with Car 4. The seatbelt extenders, which simply required Defendants Grill or O'Shea to click them into the female end of the seatbelt, sat unutilized from when they arrived on July 21, 2019 until their installation on August 14, 2019 - a period of 24 days.

70.     Szczesny and the entire Executive Board of the Union, comprised of then-Corporal Eric Bowman, then-Corporal Anthony Pluto and Officer Ben Ransom, drafted a letter to Defendant O'Shea to document the concerns of union members regarding the Department and Village's lack of concern for public and officer safety.

71.     All union executive board members expressed support for the letter and provided constructive feedback during the drafting process.

72.     On August 15, 2019, the draft of the letter was shared with the union's labor representative, Bruce Wisniewski. Wisniewski provided feedback, comments, and edits.

73.     Wisniewski stated, "I reviewed the letter to ADM regarding car #4. Your draft is perfectly acceptable. However having said that I have attached some suggestions. Truly suggestions."

74.     Another round of edits was completed pursuant to feedback offered by Wisniewski and the entirety of the union board. The final draft was circulated on August 15, 2019 and approved thereafter.

75.     On August 19, 2019, the letter, printed on FOP letterhead and attested to by the entire union board, was submitted to Defendant O'Shea in a sealed envelope and slid beneath his office door.

76.     The letter was directly addressed to Defendant O'Shea both on the outside of the envelope and in its greeting in the body of the letter.

77.     The letter was labeled as "From: FOP Lodge #46 Executive Board."

78.     The letter did not rebut that Defendants O'Shea and Grill eventually implemented a work around, but rather expressed the union's concern with the way in which the situation was

handled; mainly ordering officers to use a vehicle that posed a safety risk to themselves and the public.

79.     On or about August 20, 2019, Defendant O'Shea circulated and shared the union letter with members of the Village Administration including then-Village Administrator Eric Palm and Defendant Scheiner.

80.     On August 20, 2019, Defendant Grill posted a five-page memorandum in Roll Call on the union cork board. The memorandum was tacked through the center of the "Police Officer's Bill of Rights." Grill's memorandum claimed that Defendant O'Shea and the Administration were focused on the safety of officers from the moment the issue with Car 4 was reported.

81.     The memorandum ignored and ridiculed officer complaints, downplayed the issue, failed to address the lack of timely response on the work around that Defendant O'Shea decided to implement to remedy the car's problem. Additionally, in the memorandum, Defendant Grill personally attacked the leadership of the union in his memorandum, which was issued on department letterhead.

82.     On information and belief, Car 4 has continued to have issues related to the "Auto Park" program and the installed aftermarket seatbelt extenders. These problems include the vehicle continuing to become disabled, as Szczesny and other officers had originally reported. The vehicle has since been taken out of service on multiple occasions due to the faulty and ineffective solution that Defendants O'Shea and Grill implemented and ongoing problems with the "Auto Park" program and the vehicle's seatbelts.

83.     On or about August 21, 2019, the union executive board made the collective decision to post a copy of the letter on the union cork board in Roll Call.

84. On or about August 21, 2019, Szczesny was approached by Sergeant Buckner in Roll Call. Sergeant Buckner asked Szczesny if he was going to apologize to Defendant Grill or O'Shea for the union letter. Sergeant Buckner told Szczesny, "They are going to make this one really hurt" and that "this is going to be very painful for you."

85. On August 23, 2019, Szczesny personally emailed Defendant O'Shea, seeking a meeting to address the issues between the Administration and the Union. Defendant O'Shea never acknowledged or responded to the email.

86. Szczesny also filed a complaint with Dodge Motor Company regarding the function of the auto park feature.

### IV.    Pattern of Retaliatory Conduct

87. On or about August 20, 2019, one day after the union letter was sent, Defendant Labriola falsely accused Szczesny of inaccurately reporting on a blind photo lineup that Szczesny conducted on Defendant Labriola and Sergeant Glen Czernik's orders on August 19, 2019 (River Forest Case Number 19-01195).

88. On August 22, 2019, Szczesny received another hostile email from Defendant Labriola regarding the photo lineup and a DUI/traffic crash case (19-00412) that Szczesny had assisted on. Szczesny responded pointing out that the photo lineup was handled correctly.

89. On August 23, 2019, Szczesny received an email from Defendant Labriola accusing Szczesny of putting false information into a police report. On August 23, 2019, Defendant O'Shea sent an email to the entire union executive board via department email. Defendant O'Shea's email demanded the retraction of the union letter. Defendant O'Shea wrote, "You, as the executive board members of the board and authors of the letter, will have until Monday at 5pm to retract your letter, apologize, and ask appropriately for a meeting with the vehicle officer and Chief of Police."

90.     On August 23, 2019, Szczesny submitted the collective response of the union executive board via email to Defendant O'Shea. The email was conciliatory in nature, but the union executive board stood by the issues raised in the union letter. The email also referenced a formal request for a Labor-Management Meeting, which was submitted by Wisniewski to Defendant O'Shea.

91.     On August 25, 2019, members of the union executive board met to discuss a response to the Chief's email.

92.     Defendant O'Shea acknowledged the email on August 29, 2019 and stated, "I have spoken a few times with Bruce." O'Shea never accepted the Labor-Management meeting request submitted by the Labor Council, Szczesny's personal request to meet, or the collective union executive board's request to meet.

93.     On numerous occasions, Defendants Swierczynski and O'Shea pressed Szczesny to reveal to them the names of officers who complained about the vehicle. Szczesny responded in email with some information of underlying facts but stated that he believed the communications were subject to employee-union representative privilege.

94.     Defendant O'Shea made Defendant Scheiner aware that Szczesny would not "provide information regarding complainants who had issues with the vehicle and that he either failed to provide the information or refused to provide the information."

95.     Defendant Scheiner was aware that Szczesny had invoked union-privilege regarding the names of and his communications with those complainants, and that Defendants Swierczysnki and O'Shea were recommending discipline because of this invocation of privilege.

96.     Defendant Scheiner later agreed to and supported a formal investigation of Szczesny based upon his knowledge of privileged union complainants and their communications regarding the Department's untimely response to Car 4's auto-park malfunctions.

97.     Defendant Scheiner, in conjunction with Defendant O'Shea and Eric Palm, made the decision to retain counsel for the purpose of formally investigating and interrogating Szczesny and other union board members for their knowledge of and role in the August 19, 2019 union letter.

98.     On August 26, 2019, Defendant O'Shea met with Wisniewski and demanded that the union retract the letter or internal investigations into the union board will be initiated. Defendant O'Shea told Wisniewski that Szczesny was going to be investigated for suspicion of lying in the union letter and in police reports, and that Szczesny should quit the Department.

99.     On August 29, 2019, Defendant Swierczynski responded to Szczesny's emails regarding the names of the complainants in a threatening and retaliatory manner. Defendant Swierczysnki wrote, in part, "[y]ou do not have the authority to infer or state that I am violating an Illinois law regarding privileged information." Defendant Swierczynski continued, writing, "In addition, it fully provides as factual basis that you have provided false, misleading and half-truths in response to my multiple inquires." Defendant Sweirczynski ended the email by writing, "Besides acknowledging receipt of the email, there will be no more emails/memos between you and me on these matters.  I will be reviewing your responses and other available information.  I will be making recommendations to the Chief of Police."

100.    Defendant O'Shea threatened he would report to the Cook County State's Attorney's Office, the law school Szczesny was attending, the Law Enforcement Training and Standards Board, and the Illinois Bar Association that Szczesny was untruthful. Defendant O'Shea

told Wisniewski he would see that Szczesny was issued a "Brady Letter" and that Szczesny will receive "Gigglio treatment" as well. Defendant O'Shea told Wisniewski that he was not certain if Szczesny would even be able to become an attorney unless the union retracted the letter and Szczesny quit. Defendant O'Shea stated that if Szczesny resigned, the other members of the union executive board would be spared further discipline.

101.    On August 28, 2019, Defendant O'Shea and Wisniewski spoke on the telephone. Defendant O'Shea again threatened to discipline Szczesny up to and including termination for the union letter, and again stated that Szczesny could spare his fellow union board members from further discipline over the letter by resigning from the Department. Defendant O'Shea told Wisniewski he could "sacrifice one to save five."

102.    Defendant O'Shea stated if the union executive board did not comply with his demands, he would initiate internal investigations.

103.    On August 29, 2019, Defendant O'Shea sent a reply email to Szczesny and the other union board members within the email thread titled, "FOP Correspondence of 19 August 2019." O'Shea's email notified Szczesny and the other board members that O'Shea would "be working with the Village Administrator's Office and the Village's lead labor attorney to make decisions on what further actions and responses will be taken or initiated." At the time, Defendant Scheiner was part of the Village Administrator's Office as both the Assistant Village Administrator and the Director of Human Resources.

104.    On or about August 29, 2019, Officer Matt Landini, who was serving as sergeant-at-arms and was a member of the union executive board, approached Szczesny and advised him he was resigning from the board. Landini cited his deteriorating quality of life and fear for his job as reasons for stepping down.

105.    Executive board member Ransom wrote a letter claiming he did not support the union letter when it was issued. Ransom advised Szczesny that he did so because he was in fear of his job and specialty position and wrote the letter due to pressure exerted by Defendant O'Shea.

106.    On August 31, 2019, the Sergeants of the police department – Swierczynski, Labriola, Grill, Buckner, and Czernik authored and publicly posted a two-page letter personally attacking the union executive board. Szczesny was the main subject of the letter and was the only union executive board member personally named in the letter.

107.    On or thereabout August 30, 2019, the Sergeant's letter attacking the union and union board – written and signed in their official capacities as Sergeants of the River Forest Police Department – was forwarded by Defendant Labriola to Village Administrator Palm, Defendant Scheiner, and Defendant O'Shea.

108.    On September 10, 2019, Defendant O'Shea wrote Wisniewski an email stating "… we will be moving forward with actions by the end of the week… these are very serious indiscretions that Officer Szczesny and other patrol officers have committed."

109.    Defendant O'Shea also made comments to Wisniewski that the Board of Police and Fire Commissioners was "made up of lawyers" and who were very interested in Szczesny appearing before them regarding "his issues."

110.    At all stages of the process, Szczesny repeatedly told Wisniewski and Attorney Bailey that he wished to be included in any meetings, conversations, and email chains with Defendant O'Shea or representatives of the Village. Defendant O'Shea and/or the Village's representatives refused to allow Szczesny to participate and refused to meet with Wisniewski if Szczesny was present.

111.    Szczesny also requested to see the specific allegations of wrongful conduct being made against him. None were ever provided.

112.    On September 17, 2019, Wisniewski went to the Village to meet with Defendant O'Shea at a one on one meeting to discuss ending the conflict with a peaceful resolution. Defendant O'Shea met with Wisniewski and continued to insist on the retraction of the union letter, Szczesny's resignation, and lengthy suspensions based on alleged lying for the other executive board members. Wisniewski left the meeting with no resolution.

113.    On September 18, 2019, Defendant O'Shea pulled Wisniewski to the side after the completion of a contract negotiation meeting to discuss disciplinary issues pending against the union executive board members as a result of the letter. Defendant O'Shea continued to insist on Szczesny's resignation and stated there would be lengthy suspensions for executive board members Bowman and Pluto.

114.    Defendant O'Shea claimed that investigations into the executive board would be launched at the end of the week unless the board complied with his demands.

115.    In exchange for Szczesny's resignation, the Village offered to pay Szczesny's pay and benefits, the Village agreed to accept a non-admissions clause where Szczesny admitted to no wrong-doing and the Village would declare that there are no pending investigations accusing Szczesny of any wrongdoing, confirming nothing will be placed now or in the future in Szczesny's personnel file regarding alleged investigations. The proposal also stated the Village would only provide inquiring prospective employers Szczesny's final position, rate of pay, and dates of employment.

116. Defendant Scheiner was aware of Defendant O'Shea's communications with Wisniewski regarding discipling and investigating Szczesny and other union board members because of their August 19, 2019 union letter.

117. On September 30, 2019, the Village supplied a final "Separation Agreement" offer that did not reflect any of the terms discussed, but required Plaintiff to resign and release claims against the Defendants.

118. Defendant Scheiner knew of and sanctioned the Village's attempts to force Szczesny to sign the "Separation Agreement" and "expected" Szczesny to sign the agreement in lieu of termination.

119. Szczesny refused to enter into an agreement with the Village, but on October 1, 2019, after months of threats, retaliation, and duress, Szczesny submitted his letter of resignation, effective that day.

120. After Szczesny's resignation, the Village continued to retaliate against other executive board members. This retaliation included demoting both executive board members from the rank of Corporal down to Officers.

121. In January of 2020, executive board members were served with "Notices of Investigation" by the Village regarding the union letter. The Village retracted those notices after the FOP Labor Council threatened to file unfair labor practices charges should the Village proceed.

### V.    Post-Employment Actions Taken by Defendants

122. On October 7, 2019, Szczesny requested a copy of his personnel file.

123. On October 8, 2019, Defendant Scheiner replied with an accounting of the final payout, an offer to provide a full and accurate accounting of his belongings, and acknowledgement of Szczesny's request for his personnel file.

124.    Szczesny's personnel file was not made available within seven business days as required by the Illinois Personnel Record Review Act.

125.    Szczesny did not receive his personnel file until October 28, 2019.

126.    Szczesny reviewed the personnel file and saw a memorandum written by Defendant O'Shea to Defendant Scheiner that included false allegations and misrepresentations.

127.    The memorandum falsely stated that Szczesny had been the subject of three internal investigations (19-01, 19-02, and 19-03) that began in August of 2019. The memorandum was dated October 2, 2019, the day after Szczesny's resignation had taken effect. Szczesny was never served with any investigations in August 2019.

128.    Defendant Scheiner had already been informed of Szczesny's resignation on October 1, 2019 by Defendant O'Shea and knew the information stating Szczesny was on Administrative Leave on October 2, 2019 was false.

129.    Defendant Scheiner, acted in both her capacity as Assistant Village Administrator and as Director of Human Resources when she knowingly, intentionally, and falsely approved of listing Szczesny as having been placed on Administrative Leave on October 2, 2019 both in the memorandum, and in the Village's payroll system.

130.    Defendant Scheiner also knew that Szczesny had not been served with any notices of investigation or interrogation at any point in time.

131.    Defendant Scheiner knowingly and intentionally accepted the memorandum from Defendant O'Shea which was dated October 2, 2019. Defendant Scheiner knowingly and intentionally placed the false document in Szczesny's personnel file.

132.   In total, the Village knowingly, intentionally and falsely included several pieces of paperwork in his personnel file falsely stating that Szczesny had been placed on "Administrative Leave" on October 2, 2019 – after he no longer worked there.

133.   When the final accounting of his last paycheck was finally provided to Szczesny, it included a day of pay for Administrative Leave on October 2, 2019.

134.   Once Szczesny learned of the Village's maneuver, he returned the Administrative Leave day of pay via certified check and asked the Village to correct their records to reflect he was no longer employed there on October 2, 2019.

135.   Defendant Scheiner knowingly and intentionally collected false and misleading documents from Defendant O'Shea and James Greenwood to place in Szczesny's personnel file during this time. Defendant Scheiner accepted materials allegedly dating from as far back as 2013 without questioning why such materials had never been presented to her before.

136.   Defendant Scheiner knowingly and intentionally removed, omitted, or otherwise failed to include other awards, performance reviews, or commendations in Szczesny's personnel file that Szczesny had earned during his tenure with the Village.

137.   Defendant Scheiner did so in an attempt to negatively skew Szczesny's file and make him appear to be a bad candidate for employment if a future employer were to request the file.

138.   Defendant Scheiner has engaged in a pattern and practice of collecting adverse materials and adding said materials to the personnel files of union board members.

139.   On November 1, 2019, Szczesny had an interview with the Crystal Lake Police Department regarding employment as a full-time, sworn police officer.

21

140.   On November 4, 2019, a representative of Crystal Lake went to the Village of River Forest for the purpose of conducting a background investigation on Szczesny.

141.   Crystal Lake's representative met with a representative of the Village of River Forest[1] who falsely claimed that Szczesny was the subject of three internal investigations that had been started in August of 2019. The representative of the Village told Houlihan those internal investigations ceased on October 2, 2019.

142.   The representative of the Village falsely told Crystal Lake that Szczesny had lied in a police report.

143.   The representative of the Village falsely told Crystal Lake that notice of investigations would be served on Szczesny in October [2019].

144.   The representative of the Village falsely told Crystal Lake that the Cook County State's Attorney's Office was dropping all Szczesny's active cases.

145.   Szczesny has been subpoenaed multiple times since the end of his employment with the Village and has appeared in court for ongoing cases and continues to appear in court for his cases as of the date of this filing.

146.   The representative of the Village also falsely stated that Szczesny "did not make good" on repaying officers who had worked for him.

147.   On November 15, 2019, Szczesny contacted the Village through his attorney via a letter to object to the false and misleading documents the Village had added to Szczesny's file post-employment.

---

[1] The name is redacted in the information received by Szczesny through the Freedom of Information Act, but upon information and belief, the representative was Defendant Chief O'Shea.

148.   In the letter, Szczesny asked for the removal of the disputed documents or the attachment of a rebuttal, which was included in the letter.

149.   The Village refused to remove or correct the false documents until December 9, 2019.

150.   The Village was asked to provide another copy of Szczesny's personnel file at that time to ensure that the documents were in fact removed.

151.   Szczesny was alerted on November 20, 2019 that he was being dismissed from the hiring process with the Village of Crystal Lake due to the information provided by the Village during the background investigation.

152.   Szczesny also applied to the Oak Brook Police Department regarding employment as a full-time, sworn police officer.

153.   Szczesny tested with the department and was third on the hiring list. Szczesny entered into the hiring process shortly thereafter.

154.   During the hiring process, the third-party background investigator assigned to the case, Mike O'Malley, traveled to River Forest and met with Defendant Scheiner and Sara Phyfer, the Deputy Village Clerk.

155.   O'Malley went to the Village to perform a background check on Szczesny.

156.   Defendant Scheiner knowingly and intentionally showed O'Malley the false memorandum from Defendant O'Shea dated October 2, 2019 that stated Szczesny had been placed on Administrative Leave at the time of his investigation, notified to appear for an interrogation, and placed under investigation.

157. Defendant Scheiner knowingly and intentionally showed O'Malley false documents pertaining to alleged internal investigations 19-1, 19-2, and 19-3, which O'Malley summarized in his report.

158. Internal investigation 19-1 was allegedly an investigation into Szczesny for failing to provide the names and complaints of officers regarding the Village's handling of car 4's safety issue.

159. Internal investigation 19-2 was allegedly an investigation into a "Possible Violation of US Code 1983" and falsely accused Szczesny of submitting a false police report.

160. Internal investigation 19-3 was allegedly an investigation into the public posting of an "eight page derogatory letter that was posted in the roll call room." The summary also stated, "[t]he letter was reportedly signed as if it was from the FOP, but the investigation revealed that it was Mr. Szczesny and two other officers were the authors of the letter and not an official correspondence between the union and police management."

161. The summary of 19-3 also stated that, "[t]he administration felt that the letter contained an unwarranted personal attack, harassment, and malicious propaganda."

162. O'Malley's report also contained references to false claims by the Village that "between August 26, 2019 and September 15, 2019 the Village made attempts to meet with Mr. Szczesny. There were several delays in scheduling meetings due to circumstances causing the FOP Business Agent, Mr. Bruce Wisniewski, being able to present Mr. Szczesny to a meeting for discussions or formal interviews."

163. O'Malley's report lists the allegations as "integrity violations," "lying in his official capacity," "unreasonable use of discretion," and "failure to in his obedience to an order."

164. All of Szczesny's other background summaries in O'Malley's report are positive.

24

165.    On January 14, 2020, Szczesny was notified via email by Kathy Koubek, the Administrative Coordinator of the Oak Brook Police Department, that he was being disqualified from the hiring process due to his "failure to pass the character and background requirement of the testing process."

166.    On December 24, 2019, the Village finally provided Szczesny with an updated copy of his personnel file pursuant to his November 15, 2019 request.

167.    The new copy of the personal file included the addition of approximately seventy-two additional pages of previously unseen disciplinary documents, email chains, and other petty attempts to besmirch Szczesny's character and quality of work.

168.    The documents included in the new personnel file were not documents that are typically included in personnel files and were not part of the file when he reviewed it on previous occasions. The documents violated both the union contract, police department general orders, and the Illinois Personnel File Review Act.

169.    The documents in the file were cherry picked to make Szczesny look bad to any prospective employers. None of the commendations that he received or email chains complimenting his work were included in the file.

170.    The documents either lacked context, were an effort to disparage Szczesny, or were documents that had never been presented to Szczesny and were either false or misleading.

171.    On February 19, 2020, Szczesny, by and through his attorney, submitted a rebuttal and supplement documents that were either removed or excluded from his personal.

172.    The Village failed to acknowledge or attach the rebuttal and supplement documents.

173.     On May 22, 2020, Szczesny contacted Defendant Scheiner via email and again requested a complete copy of his personnel file.

174.     On May 29, 2020 Defendant Scheiner supplied Szczesny with an electronic copy of his personnel file. That file did not include the supplemental documents that Szczesny had attached to his rebuttal.

175.     On June 1, 2020, Defendant Scheiner finally provided a copy of Szczesny's personnel file that included the full rebuttal and supplemental documents.

176.     Defendant Scheiner knowingly and intentionally violated the Illinois Personnel Records Review Act when she failed to either provide Szczesny with a copy of his file within seven (7) working days of his request and/or attach rebuttal documents submitted by Szczesny.

177.     Szczesny has been disqualified or passed up for employment by at least three police departments.

178.     In December 2021, Szczesny graduated from law school, applied for admission to the Illinois Bar, and applied to take the Illinois Bar Exam. As part of this process, Szczesny completed numerous forms including forms requiring details of former employment and employers.

179.     On December 7, 2020, Szczesny completed and submitted his application.

180.     On March 4, 2021, Szczesny's application was downloaded by the Admissions Office and the office began processing the application.

181.     On April 1, 2021 Counsel Yvette Heintzelman for the Village called Szczesny's counsel and advised her that the Illinois Board of Admissions to the Bar was seeking information about Szczesny's employment at the Village. Heintzelman stated that a non-response from the Village would "not be good" for Szczesny's application.

182.    On April 2, 2021 Heintzelman forwarded Szczesny's counsel a letter from the Illinois Board of Admissions to the Bar requesting information about Szczesny's employment at the Village of River Forest. The letter was dated March 1, 2021.

183.    On April 6, 2021 Szczesny was notified by the Illinois Board of Admissions to the Bar that he had successfully passed the Illinois Bar Exam.

184.    On April 6, 2021, Szczesny also received a letter via the Bar Commission's online portal from the Illinois Board of Admissions to the Bar stating his "character and fitness application contains one or more matters of concern to the Board and Committee on Character and Fitness." In the letter, Szczesny was referred to the Committee on Character and Fitness for a mandatory interview to be approved to be barred.

185.    That day Szczesny called his bar processor, Tara Henrikson, via telephone and spoke to her about the referral of his application to the Committee on Character and Fitness. Henrikson advised him that the referral was due to the Village of River Forest's refusal and failure to respond to numerous inquiries from the Board of Admissions to the Bar on the course of the last month. Henrickson advised Szczesny she had called the Village at least ten times and sent three hard copies of letters seeking to verify Szczesny's employment there with no response.

186.    On April 16, 2021, Szczesny was forced to attend and participate in a Character and Fitness Hearing due to the Village's knowing and intentional efforts to sabotage his ability to be barred. Defendant Scheiner, acting as both the Village's Director of Human Resources and the now-promoted Acting Village Administrator, was responsible for both the decision to ignore the Board of Admissions to the Bar and failure to provide complete and truthful information when requested.

## VII.    Policy, Custom, Or Pattern of Retaliation Against Union Executives

187.    The Village has a policy, custom, or pattern of targeting union executive board members for harsher disciplinary measures by Sergeants, the Department Administration, and the Village Administrations.

188.    In 2015, then-union president Pate and other members of the executive board brought forth union member complaints regarding officer safety at the execution of a search warrant. In retaliation for those complaints, Defendant O'Shea initiated an internal investigation into the union that resulted in the forced resignation of union president Pate, and lengthy suspensions for fellow union executive board members Pluto and Cromley.

189.    Cromley and Pluto repeatedly warned Szczesny and other members of the Department that Defendant O'Shea disliked union stewards and would attempt to undermine and discipline them to intimidate those employees.

190.    A veteran officer warned Szczesny to be careful when standing up for union members and their rights and interests because the administration will "retaliate," "bully," "harass," and "target" him for being a union steward.

191.    Swierczynski warned Szczesny that he needed to be extremely careful in his role as union president because the Chief will try to get him. Swierczynski warned Szczesny that he had a target on his back.

192.    On December 20, 2018, Sergeant Buckner issued Szczesny a "Notable Performance Counseling," which purported to be a summary of a conversation between Buckner and Szczesny from earlier in the shift.

193.    Szczesny read the document and concluded that it was inaccurate. Szczesny asked for additional time to review the document when he returned for duty that night, as it was after

6:30 a.m. and his shift had concluded. Buckner said that Szczesny must sign the document immediately because the "boss wants this today," referencing Defendant O'Shea.

194.    Szczesny reluctantly signed the document under duress, but immediately emailed Buckner after walking out of the police department to express his concern with what had occurred. In his email, Szczesny requested that Buckner not submit the document due his lack of concurrence as to its content.

195.    Upon returning to work at 11 p.m. on December 20, 2018, Szczesny asked to speak with Buckner regarding what had occurred that morning. During the conversation Buckner told Szczesny, "Don't you know how this works? You're union president, you're going to get it harder."

196.    On May 15, 2019, Sergeant Buckner called Szczesny into the sergeant's office and advised him that Defendant Labriola had sent her an email regarding Szczesny's physical appearance and timeliness in felony court on May 10, 2019. Defendant Labriola made allegations regarding the time that Szczesny arrived at court, that Szczesny was out of uniform, and that Szczesny was wearing a baseball cap when he arrived.

197.    Szczesny advised Buckner that the claims Defendant Labriola made were untrue, and that he felt as if this was ongoing harassment and retaliation based on Szczesny's role in the union and union activities.

198.    Buckner reminded Szczesny that due to his position as union president he should "expect to get harder from the bosses and the Department."

199.    On August 8, 2019, Szczesny was assigned to "Driving Training" on August 14, 15, and 16 by Sergeant Swierczynski. This re-assignment was made on extremely short notice –

outside of Department norms – and with the knowledge that Szczesny was attending law school, and that it would likely disrupt his class schedule.

## COUNT I

### (42 U.S.C. § 1983 First Amendment Retaliation
### Against All Defendants)

200.    Plaintiff realleges, adopts, and incorporates the preceding paragraphs as though fully set forth herein.

201.    Defendants unlawfully retaliated against Plaintiff for the exercise of his rights under the First Amendment. The First Amendment protects a wide spectrum of free speech and association, including a public employee's right to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances.

202.    By associating with the union and exercising his rights as a union executive to advocate for officer safety and criticize the department's response to an officer safety issue, and by associating with others involved in the union, Plaintiff was engaged in the exercise of his rights under the First Amendment.

203.    Defendant O'Shea engaged in threatening and retaliatory conduct against the executive board of the union based on their engagement in protected and concerted activities for the mutual aid and protection of their fellow members.

204.    Defendant O'Shea attempted to discourage, coerce, and undermine the union executive board from standing by their letter.

205.    Defendants intentionally subjected Plaintiff to unequal and retaliatory treatment by retaliating against Plaintiff and other union executives as set forth above.

206.    Defendants' actions reflect a policy, custom, or pattern of official conduct of engaging in and condoning retaliation against individuals based in violation of the First Amendment.

207.    Defendant O'Shea, as the Chief of Police, was the final decisionmaker in the retaliation against Plaintiff.

208.    The actions of Defendants against Plaintiff violated his rights guaranteed under the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

**WHEREFORE,** Plaintiff seeks the following relief:

a.    All wages and benefits Plaintiff would have received but for the retaliation, including but not limited to back pay, front pay, future pecuniary losses, and pre-judgment interest;

b.    Compensatory damages in an amount to be determined at trial;

c.    A permanent injunction enjoining the Defendants from engaging in the retaliatory practices complained of herein;

d.    A permanent injunction requiring that the Defendants adopt employment practices and policies in accord and conformity with the requirements of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and further requiring that Defendants adopt and initiate effective remedial actions to ensure equal treatment and non-retaliation of employees;

e.    A declaratory judgment that Defendants' actions violate the First Amendment to the United States Constitution;

f.    The Court retain jurisdiction of this case until such time as it is assured that the Defendants have remedied the policies and practices complained of herein and are determined to be in full compliance with the law;

g.    Punitive damages as allowed by law as against the individual Defendants only;

h.    An award of reasonable attorneys' fees, costs, and litigation expenses; and

i.    Such other relief as the Court may deem just or equitable.

## COUNT II[2]

### Defamation *per se*
### (Against Defendants Village of River Forest, O'Shea, and Scheiner)

209.    Plaintiff realleges, adopts, and incorporates the preceding paragraphs as though fully set forth herein.

210.    Defendants knowingly and willfully caused or participated in the publication of statements that were false and without any foundation or basis as there is no evidence to substantiate the statements.

211.    Defendants made these defamatory and slanderous statements regarding Plaintiff to third parties with malicious intent and for the purpose of attacking Plaintiff's character and credibility.

212.    The nature and substance of the false statements imputed to Plaintiff the violation of laws.

213.    The nature and substance of the false statements imputed to Plaintiff an inability to perform or a lack of integrity in the discharge of his duties as a police officer.

214.    The nature and substance of the false statements prejudiced Plaintiff and imputed to Plaintiff a lack of ability in his profession.

215.    Defendants made the false statements with the direct intent to injure Plaintiff or in reckless disregard of the Plaintiff's rights and the resulting consequences.

216.    Defendants made the false statements with actual malice, with knowledge that it was false or with reckless disregard of its truth.

---

[2] Plaintiff amends his Complaint in accordance with the Court's decision of June 7, 2021. Plaintiff incorporates and references Count II from the previous Complaint and preserves the Count for appeal but does not pursue it in his Amended Complaint.

217.    As a result of the false statements made by Defendants, Plaintiff has suffered economic loss, mental suffering, personal humiliation, impairment of personal and professional reputation and standing in the community.

**WHEREFORE,** Plaintiff seeks the following relief:

a.  All wages and benefits Plaintiff would have received but for the retaliation, including but not limited to back pay, front pay, lost future wages, future pecuniary losses, and pre-judgment interest;

b.  Compensatory damages in an amount to be determined at trial;

c.  Punitive damages as allowed by law;

d.  An award of reasonable attorneys' fees, costs, and litigation expenses; and

e.  Such other relief as the Court may deem just or equitable.

## COUNT III

**(Intentional Interference with Prospective Economic Advantage
Against Defendants Village of River Forest, O'Shea, and Scheiner)**

218.    Plaintiff realleges, adopts, and incorporates the preceding paragraphs as though fully set forth herein.

219.    Plaintiff had a reasonable expectation of entering a valid business relationship with the Village of Chrystal Lake and/or the Oakbrook Police Department.

220.    Defendants were aware of Plaintiff's expectancy to enter into a business relationship with these Departments as the departments contacted Defendants O'Shea and Scheiner about the prospective business relationship.

221.    Defendants O'Shea and Scheiner purposefully and intentionally interfered with Plaintiff's prospective business relationships by providing false and misleading information to Oakbrook and Chrystal Lake about Plaintiff.

222.    As a result of Defendants' interference Plaintiff did not obtain the business relationships with Chrystal Lake, Oakbrook, or other police departments to which he applied.

223.    Plaintiff has suffered harm to his professional reputation, integrity, and harm, damages, lost wages, pain, suffering, emotional distress, embarrassment, and humiliation.

**WHEREFORE,** Plaintiff seeks the following relief:

a.    All wages and benefits Plaintiff would have received but for the retaliation, including but not limited to back pay, front pay, lost future wages, future pecuniary losses, and pre-judgment interest;

b.    Compensatory damages in an amount to be determined at trial;

c.    Punitive damages against individual Defendants as allowed by law;

f.    An award of reasonable attorneys' fees, costs, and litigation expenses; and

g.    Such other relief as the Court may deem just or equitable.

## COUNT IV

### (Illinois Personnel Record Review Act against Defendant Village of River Forest)

224.    Plaintiff repeats and realleges the preceding paragraphs against Defendant Village of River Forest as though fully set out herein.

225.    On October 7, 2019, Szczesny requested a copy of his personnel file pursuant to the Illinois Personnel Record Review Act, 820 ILCS 40/1 *et seq.* ("IPRRA").

226.    Szczesny did not receive his personnel file until October 28, 2019.

227.    On or about May 26, 2021, Defendant Scheiner admitted under oath that the Village of River Forest did not comply with the timeliness requirements of the Act.

228.    Szczesny reviewed the personnel file and saw a memorandum written by Defendants O'Shea to Scheiner that included false allegations and misrepresentations.

229.     The memorandum falsely stated that Szczesny had been the subject of three internal investigations (19-01, 19-02, and 19-03) that began in August of 2019.

230.     The memorandum was dated October 2, 2019, the day after Szczesny's resignation had taken effect.

231.     The Village also included paperwork in his personnel file falsely stating that Szczesny had been placed on "Administrative Leave" on October 2, 2019 – after he no longer worked there.

232.     On November 15, 2019, Szczesny contacted the Village through his attorney via a letter to object to the false and misleading documents the Village had added to Szczesny's file post-employment.

233.     In the letter, Szczesny asked for the removal of the disputed documents or the attachment of a rebuttal, which was included in the letter.

234.     The Village refused to remove or correct the false documents until December 9, 2019.

235.     The Village was asked to provide another copy of Szczesny's personnel file at that time to ensure that the documents were in fact removed.

236.     Defendants gave false information pertaining to alleged internal investigations to Szczesny's prospective employers.

237.     On December 24, 2019, the Village finally provided Szczesny with an updated copy of his personnel file pursuant to his November 15, 2019 request.

238.     The new copy of the personal file included the addition of approximately seventy-two additional pages of previously unseen disciplinary documents, email chains, and other petty attempts to besmirch Szczesny's character and quality of work.

239.     The documents included in the new personnel file were not documents that are typically included in personnel files and were not part of the file when he reviewed it previously in October. The documents violated both the union contract, police department general orders, and the Illinois Personnel File Review Act.

240.     Because Defendants failed to timely produce his personnel file as required by the IPRRA, then manipulated his personnel file to include false and misleading documents in his personnel file, Plaintiff was forced to file a complaint with the Illinois Department of Labor ("IDOL") for this violation. Plaintiff exhausted his administrative remedies prior to filing his Complaint.

241.     As a result of Defendant's violations of the Illinois Personnel Record Review Act, Plaintiff has suffered harm to his professional reputation, integrity, and harm, damages, lost wages, pain, suffering, emotional distress, embarrassment, and humiliation.

**WHEREFORE,** Plaintiff prays for judgment against Defendant for the following: an adverse inference against Defendant for violating the IPRRA and its willful manipulation of documents contained in Plaintiff's personnel file, actual damages, award $200 per violation plus costs, reasonable attorney's fees, and actual damages for a willful and knowing violation of this Act, and award Plaintiff any and all other relief to which he may be entitled.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues for which a jury trial is allowed.

Respectfully Submitted,

DANIEL SZCZESNY


*/s/ Heidi Karr Sleper*

_____

Attorney for Plaintiff

Heidi Karr Sleper, Esq. Atty No. 6287421
Jacob D. Exline, Esq. Atty No. 6326874
KURTZ, SLEPER & EXLINE, LLC
610 W. Roosevelt Rd., Suite A2
Wheaton, IL 60187
Phone: (630) 323-9444
Email: hsleper@kurtzlaw.us
Email: jexline@kurtzlaw.us